**Joseph G. Sansone**
**Assunta Vivolo**
**Derek M. Schoenmann**
**Jawad B. Muaddi**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004-2616**
**(212) 336-9113 (Schoenmann)**
**schoenmannd@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| **Plaintiff,** | **25 Civ. _____ (    )** |
| -against- | |
| **TRIJYA VAKIL and NEERAJ VISEN,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Trijya Vakil ("Vakil") and Neeraj Visen ("Visen"), alleges as follows:

## SUMMARY

1.      This matter concerns insider trading by Vakil and Visen in the securities of Kindred Biosciences, Inc. ("Kindred") before the June 16, 2021 announcement that Vakil's employer, Elanco Animal Health, Inc. ("Elanco), had agreed to acquire all outstanding shares of Kindred stock for $9.25 per share in cash (the "Announcement").

2.      Vakil obtained material nonpublic information ("MNPI") about Elanco's upcoming acquisition of Kindred ("Acquisition") through her employment at Elanco. Beginning on or about April 16, 2021, Vakil took part in Elanco's due diligence relating to the Acquisition.

On May 12, 2021, in violation of her duties to Elanco, Vakil purchased Kindred stock while aware of and based on that MNPI. When Kindred's stock price rose by about 46% following the Announcement, Vakil obtained ill-gotten gains of $2,447.50.

3.    Along with trading in Kindred stock on the basis of the MNPI that she misappropriated from Elanco, Vakil also, in further violation of her duties to Elanco, tipped her friend Visen about the upcoming acquisition. On June 15, 2021, the day before the Announcement, Visen used the MNPI that he had obtained from Vakil to purchase Kindred stock. When Kindred's stock price rose by about 46% following the Announcement, Visen obtained ill-gotten gains of $109,437.

## VIOLATIONS

4.    Through the above conduct and as alleged further here, Vakil and Visen have violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

5.    Unless Vakil and Visen are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

6.    The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) and 21A [15 U.S.C. §§ 78u(d) and 78u-1].

7.    The Commission seeks a final judgment: (a) permanently enjoining Vakil and Visen from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Vakil and Visen to disgorge all ill-gotten gains they received because of their violations alleged herein and to pay prejudgment interest on it pursuant to Exchange Act

2

Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Vakil and Visen to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; and (d) ordering any other relief the Court may deem just and proper.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Sections 21, 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u, 78u-1, and 78aa].

9.      Vakil and Visen, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

10.      Venue in this District is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred in the Southern District of New York.  At all times relevant to this action, the securities Vakil and Visen traded illegally were traded on the Nasdaq Stock Market ("Nasdaq"), which is headquartered in this District.

## DEFENDANT

11.      **Vakil**, age 52, resides in Wynnewood, Pennsylvania.  During the relevant period, Vakil was employed at Elanco as Senior Director, Product Innovation.  She currently serves as Director of Global Marketing a pharmaceutical company.  Vakil has never been associated with any entity registered with the Commission.

12.      **Visen**, age 51, resides in Lutz, Florida.  During the relevant period, Visen was employed as Senior Licensing Manager at a university in Florida, and later as the Director of Licensing for Engineering at a university in Connecticut.  Visen has never been associated with any entity registered with the Commission.

3

**OTHER RELEVANT ENTITIES**

13.      **Kindred** was a Delaware corporation headquartered in Burlingame, California. Kindred was a biopharmaceutical company focused on developing novel pet therapeutics. During the relevant period, Kindred's common stock was listed on the Nasdaq Stock Market under the symbol "KIN."

14.      **Elanco** is an Indiana corporation headquartered in Greenfield, Indiana.  Elanco is a biopharmaceutical company specializing in products to prevent and treat disease in farm animals and pets.  During the relevant period, Elanco's common stock was listed on the New York Stock Exchange ("NYSE") and traded under the symbol "ELAN."

**FACTS**

**I.      Background**

**A.      Elanco's Acquisition of Kindred**

15.      In or around April 2021, representatives of Elanco and Kindred began discussing the possibility of a merger or similar transaction between the two companies.

16.      On April 16, 2021, Elanco submitted a non-binding offer to acquire Kindred at a price between $8 and $10.50 per share in cash.  Over the next several months, Elanco performed due diligence in anticipation of an acquisition of Kindred while representatives of Elanco and Kindred continued to negotiate the deal terms.

17.      By May 31, 2021, all other prospective bidders had discontinued negotiations with Kindred, and most of the key terms (including the acquisition price per share) were agreed upon between Kindred and Elanco.

18.      The Boards of Directors of Elanco and Kindred approved the merger on June 14 and June 15, 2021, respectively, and the Acquisition was announced publicly on June 16, 2021.

4

**B.      Vakil's Role and Obligations to Elanco**

19.      As Senior Director of Product Innovation at Elanco, Vakil served as part of a cross-functional team supporting new product development and pipeline investments, with a focus on evaluating risk, future revenue potential, and overall portfolio strategy.

20.      Vakil was subject to Elanco's policies and procedures regarding insider trading and treatment of MNPI obtained in connection with her employment.

21.      Elanco's insider trading policy expressly prohibited employees from trading on, or disclosing, confidential information obtained through their employment, including "trading in the securities of another company if you become aware of material, non-public information about that company in the course of your position with [Elanco]."

22.      Before and during the relevant period, Vakil participated in training courses on Elanco's Code of Conduct, including its insider trading policy.  She completed one of those trainings in or around May 2021, and the written materials provided in connection with that training included these directives: "Do not buy, sell, or trade Elanco stock while in possession of important, nonpublic information about Elanco … Do not disclose important, nonpublic information about Elanco to others who may buy, sell, or trade Elanco stock… [and] *take the same trading and disclosure precautions for other publicly traded companies whose important, nonpublic information you may learn about in the course of your work at Elanco (for example, companies with which Elanco has a significant relationship, existing or proposed)*" (emphasis added).

**II.    Vakil Participated in Elanco's Due Diligence of Kindred and Obtained MNPI About the Upcoming Acquisition**

23.    On April 16, 2021, the same day that Elanco submitted its first non-binding offer to acquire Kindred, Elanco assembled a cross-functional team to complete its due diligence on Kindred.

24.    Vakil was assigned to the due diligence team that same day to help assess the transaction from a product strategy and technical risk perspective.

25.    Upon being assigned to the due diligence team, Vakil was told that the due diligence related to a planned acquisition of Kindred and that it was highly confidential.

26.    Although Elanco had assigned a code name to the potential acquisition ("Project Knight"), internal emails – including emails Vakil sent and/or received in connection with her work on the due diligence team – used the name Kindred interchangeably with the code name "Knight."

27.    For example, on April 16, 2021, Vakil received an email from a senior business development manager and due diligence team lead with the subject "KNIGHT – update," which referred to Kindred by name in the body of the email.

28.    On April 23, 2021, Vakil sent an email to a colleague in which she herself referred to the due diligence project as "knight (kindred)."

29.    On May 5, 2021, Vakil participated in an email exchange with other members of the due diligence team in which she discussed product data that her team had received from Kindred.

30.    Many other emails written or received by Vakil between April 16 and May 12, 2021 also referred to Kindred by name as the subject of the due diligence.

31.   These communications also highlighted the confidential nature of the potential transaction.

32.   For example, certain emails written or received by Vakil referred to Project Knight as "RED Company Confidential Information."  Under Elanco's information handling policies, "RED" was the most restrictive designation, and was reserved for information that "requires the most significant protective measures and procedures" because "loss, theft, unintentional disclosure or compromise could result in serious damage to Elanco."

33.   In addition, on at least one occasion, members of Elanco's business development team advised Vakil orally that the prospective acquisition was confidential and should not be disclosed to anyone.

## III.   Vakil Knowingly Purchased Kindred Stock in Violation of Her Duties to Elanco

34.   On May 12, 2021, following an internal meeting in which the Project Knight due diligence team (including Vakil) discussed their initial findings, Vakil purchased 500 shares of Kindred stock in her online brokerage account.

35.   Vakil bought Kindred stock because she believed the stock price would increase when the Acquisition was announced.

36.   Although she traded stocks periodically, Vakil had not traded Kindred securities.

37.   The Announcement was made before the market open on June 16, 2021.  The price of Kindred shares increased by about 46% from the prior day's closing price of $6.34 per share to close at $9.23 per share.

38.   Vakil sold all her Kindred shares on June 16, 2021, obtaining ill-gotten gains of $2,447.50.

**IV.    Vakil Knowingly Shared MNPI About the Acquisition with Visen in Further Violation of Her Duties to Elanco, and Visen Unlawfully Traded on It**

39.    Vakil and Visen are long-time friends who grew up together in India.  They speak on the phone periodically and sometimes attend social events together.

40.    For example, in February 2020, Visen traveled from Florida to New Jersey to spend the weekend at a beach house with Vakil and several other friends.  Vakil picked Visen up at Newark Airport while the other guests traveled separately.

41.    During 2021, Vakil and Visen communicated regularly via an instant messaging app and weekly videoconference calls, some of which included other friends whom they had grown up with.

42.    In or around May 2021, Vakil disclosed to Visen that Kindred would soon be acquired by Vakil's employer, Elanco, and that she thought Kindred's stock price would go up as a result.

43.    Vakil mentioned the potential acquisition two or three times in videoconference calls and instant message conversations with Visen during the month leading up to the Announcement, including telling Visen that she was working on a project to evaluate the proposed acquisition of Kindred for Elanco's leadership.

44.    In at least one conversation, Vakil told Visen that she had purchased Kindred stock for her own account.

45.    On or about June 15, 2021, Vakil advised Visen that Elanco's acquisition of Kindred would be announced in a day or two.

46.    Vakil disclosed information about the impending acquisition to Visen as an act of friendship, intending that her friend would trade on the information.

47.    Visen understood that information about the impending acquisition was nonpublic and that Vakil was not permitted to disclose it.

48.    On June 15, 2021, shortly after Vakil informed him of the imminent Announcement, Visen – an infrequent trader who had never before traded Kindred securities – purchased 38,000 shares of Kindred stock in his brokerage account.

49.    The next day, following the Announcement, the price of Kindred shares increased by about 46% from the prior day's closing price of $6.34 per share to close at $9.23 per share. As a result, Visen generated ill-gotten gains of $109,437.

50.    After the Announcement, Vakil asked Visen if he had purchased Kindred stock based on their prior conversations, and when Visen said that he had, Vakil said "good for you."

**V.    Vakil Lied to Elanco and the FBI, and Asked Visen to Lie to the FBI for Her**

51.    On or about September 21, 2021, for purposes of responding to a FINRA inquiry, Elanco emailed a list of individuals who had traded Kindred stock ahead of the Announcement to all Elanco personnel who had been involved in the transaction, including Vakil, asking if they knew anyone on the list.  Visen's name was on the list.

52.    Vakil responded that she knew no one on the list, and her false statement was incorporated into Elanco's response to FINRA.

53.    Vakil later told Visen about this email exchange with her employer, assuring Visen that she had left his name out of her response.

54.    On December 21, 2023, the FBI telephoned Vakil and asked her about her and Visen's Kindred trading.

55.    During that conversation, Vakil first told the FBI that she did not learn about the potential Kindred acquisition until after she had purchased Kindred stock, although she later admitted that was untrue.

9

56. Vakil told the FBI that, while she could not recall specifically mentioning the planned acquisition to Visen, it was possible that she may have let it slip once as a result of job frustration, but not intending for Visen to trade on it.

57. The FBI concluded the interview by asking Vakil if she would call Visen and allow them to record the conversation. She said she would consider it and suggested they speak again later that day.

58. In the interim, Vakil informed Visen about law enforcement's plan to record the two of them talking. Vakil asked Visen to corroborate her story that she only mentioned the planned acquisition to him once during a moment of job-related frustration, which was false. Visen, however, declined to answer when Vakil called him back with the FBI on the line.

**FIRST CLAIM FOR RELIEF**
**Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

59. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 58.

60. Vakil and Visen, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

10

61.     By reason of the foregoing, Vakil and Visen, directly or indirectly, violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Vakil and Visen from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Vakil and Visen to disgorge all ill-gotten gains by which they were unjustly enriched, with pre-judgment interest thereon, as a result of the alleged violations pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

**III.**

Ordering Vakil and Visen to pay civil monetary penalties under Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

**IV.**

Pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], permanently prohibiting Vakil and Visen from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## V.

Granting any other and further relief this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

trial by jury in this action of all issues so triable.

Dated:  New York, New York
        July 10, 2025

                                   */s/ Derek M. Schoenmann*
                                   Derek M. Schoenmann

                                   Joseph G. Sansone
                                   Assunta Vivolo
                                   Derek M. Schoenmann
                                   Jawad B. Muaddi
                                   Attorneys for Plaintiff
                                   SECURITIES AND EXCHANGE COMMISSION
                                   New York Regional Office
                                   100 Pearl Street, Suite 20-100
                                   New York, New York 10004-2616
                                   (212) 336-9113 (Schoenmann)
                                   schoenmannd@sec.gov